IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN RYL-KUCHAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-3223 |
| | ) | |
| CARE CENTERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Kathleen Ryl-Kuchar ("Ryl-Kuchar") filed on August 29, 2006 a First Amended Complaint, asserting that the defendant Care Centers, Inc. ("Care Centers") retaliated against her for and interfered with her exercise of her rights under the Family Medical Leave Act ("FMLA") and intentionally inflicted emotional distress. Care Centers filed a counterclaim, seeking repayment of Ryl-Kuchar's salary and car allowance, for which summary judgment was granted against Care Centers (Dkt. No. 120). Now Care Centers files a motion for summary judgment on Ryl-Kuchar's claims. (Dkt. No. 107.) For the reasons stated below, the motion is granted in part and denied in part.

BACKGROUND

Taking all facts and inferences in favor of the nonmoving party, Ryl-Kuchar, the court recites the relevant evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ryl-Kuchar worked as a full-time dietary consultant at Care Centers visiting various nursing facilities out in the field under the supervision of Bernadette Sanders ("Sanders"), Mark Steinberg

1

("Steinberg"), Chris Wayer, and Chris Verddin. (Def. L.R. 56.1 Stmt. ¶¶ 1-2.) Ryl-Kuchar discovered she was pregnant with triplets in December 2002, and informed Steinberg around that time that she intended to take maternity leave. (*Id*. ¶ 3.) When she told Care Centers about her pregnancy, she stated that she did not wish to take leave until after the birth of her triplets if necessary. (*Id*. ¶ 6.) Some point between January and May 2003, when Barb Balthazor ("Balthazor"), Care Centers' Director of Human Resources, found out that Ryl-Kuchar was pregnant, the two discussed FMLA leave. (*Id*. ¶ 5.)

Care Centers faxed the FMLA "certification of heath-care provider form" to Ryl-Kuchar's doctor. (Pl. L.R. 56.1. Stmt. Exs. F; I at Ex. 1.) The filled-out FMLA certification given to Care Centers by Ryl-Kuchar stated that Ryl-Kuchar's qualifying condition was her pregnancy with triplets. (*Id.*) Her expected due date was August 25, 2003, and that she may have to work intermittenly or work less than a full schedule because she "will be on bedrest from 25 weeks [arrow] until 2 months post C-section." (*Id.*) The FMLA certification also stated that "Incapacity will be from May 11th until 2 months post-delivery." (*Id.*) The FMLA certification was unsigned and undated. (*Id.*) There is no evidence that Care Centers notified Ryl-Kuchar of any deficiencies in her FMLA certification or asked her to provide additional information.

Due to her pregnancy, Ryl-Kuchar could no longer drive as of some point in May 2002, and she began to work from home as of either May 9, 11 or 22, 2003. (Pl. L.R. 56.1. Stmt. ¶¶ 9-10.) Ryl-Kuchar informed Sanders that she planned to work from home as of May 22, 2003. (*Id*. ¶ 11.) Ryl-Kuchar also understood a conversation with Steinberg to mean that she could work from home. (Def. L.R. 56.1. Stmt. Ex. 1 at 252.) Ryl-Kuchar, however, did not discuss whether she could work part-time from home with Steinberg. (*Id.*) In fact, the only conversation

2

that Ryl-Kuchar had with Care Centers regarding whether she could work part-time before the birth of her children was noted in Balthazor's May 13, 2005 "Compliance Review" memorandum submitted to the Department of Labor, where Balthazor states the following:

> In February of 2003 Ryl-Kuchar presented a verbal request to work from home so that she could initiate a reduced work schedule and initiate FMLA leave on an intermittent basis. The organization indicated that this would only be possible on an extremely limited basis because of the nature of her position, which required her to be on-site at the facilities. The approval was conditional upon her ability to perform bon-a-fide [sic] work, which was extremely limited. This was a general discussion only. But again Ryl-Kuchar was uncertain as to when or if this would be necessary. No time frames were ever indicated from as to when this would be necessary. It was a "what if" conversation.

> That was the last conversation that was ever initiated by Ryl-Kuchar regarding her FMLA. Although she provided a completed medical certification form she made it very clear that the date she would initiate intermittent leave or continuous leave was uncertain. Again she was informed that she was responsible to notify the organization as soon as possible once she was unable to continue her responsibilities.

(Pl. L.R. 56.1 Stmt. Ex. F.) Ryl-Kuchar did not have permission to work part-time after May 22, 2006, yet Ryl-Kuchar worked between 20-34 hours a week from May 22, 2006 until July 25, 2003 while being paid her full time salary. (*Id.* Ex. I, Exs. 3-15; Def. L.R. 56.1 Stmt. Ex. 1 at 253.) Ryl-Kuchar explained in her deposition, however, that she did not require the bed rest that her health care provider had noted on her FMLA certification form. (Def. Reply L.R. 56.1. Ex. A at 177-78.) Working less than 35 hours a week constitutes part-time work according to Care Centers' Employee Handbook. (Def. L.R. 56.1. Ex. B.) Ryl-Kuchar's hours were documented on time sheets that were incomplete and written by her mother, who was also an employee at Care Centers, based on information provided by Ryl-Kuchar. (Def. L.R. 56.1 Stmt. ¶ 20; Pl. Resp. ¶ 20.) The Care Centers's Employee Handbook requires all employees to maintain an accurate record of all time worked and makes a dischargeable offense the falsifying or alterning of any time-keeping record. (Def. L.R. 56.1. Ex. B.) The parties dispute whether

3

Ryl-Kuchar, by dictating her hours to her mother, falsified records.

On July 16, 2006, more than a month before her expected due date, Ryl-Kuchar gave birth to her triplets. (Pl. L.R. 56.1 Stmt. ¶ 16.) Sometime after the birth, Ryl-Kuchar spoke with Sanders and informed her of Ryl-Kuchar's intention to take maternity leave. (Def. L.R. 56.1. Ex. 1 at 54.) Ryl-Kuchar worked through July 25, 2006 and then took maternity leave. (Def. L.R. 56.1 Stmt. Ex. 1 at 257.) Care Centers paid Ryl-Kuchar her car allowance, even though she was no longer able to drive, and her full salary from May 22, 2003 to July 31, 2003, and withheld her health care premiums. (Pl. L.R. 56.1. Stmt. ¶ 19.)

At some point during Ryl-Kuchar's maternity leave, an audit by Care Centers' health insurance plan, "CCS-VEBA," a plan not administered by Care Centers itself, established that Ryl-Kuchar had not been working full-time before taking maternity leave. (Def. L.R. 56.1. Stmt. ¶¶ 38, 40.) During this period, Balthazor and Sanders telephoned Ryl-Kuchar to discuss that she was overpaid in wages and car allowance. (Def. L.R. 56.1. Stmt. ¶ 55, Ex. F.) Ryl-Kuchar recollects that she responded that she would repay the car allowance if she was not entitled to it. (Def. L.R. 56.1. Stmt. ¶ 55, Ex. F; Pl. L.R. 56.1. Stmt. ¶ 37.) Subsequent to the telephone conversation, Balthazor sent Ryl-Kuchar a letter dated August 27, 2003. (Def. L.R. 56.1. Stmt. ¶ 56.) In the letter, Balthazor stated that Care Centers was investigating overpayments of Ryl-Kuchar's salary and car allowance based on evidence that she had not been working since March 1, 2003. (Def. L.R. 56.1. Stmt. Ex. F at Ex. A). The letter formally requested Ryl-Kuchar to provide a detailed summary of the work performed and hours worked since March 1, 2003 within ten days of receiving the letter. (*Id.*) Ryl-Kuchar did not respond to the letter, and claimed that she never received it. (Pl. L.R. 56.1. Resp. ¶ 56.) Sometime between her

conversation with Balthazor and the second week in September 2003, Ryl-Kuchar left three messages with Steinberg asking him to call her back about whether she could work part-time when she returned. (Pl. L.R. 56.1. Ex. A at 92.) Steinberg did not return Ryl-Kuchar's telephone calls. (Id.)

On October 1, 2003, Ryl-Kuchar submitted a written resignation to Care Centers. (Pl. L.R. 56.1. Stmt. ¶ 20.) Following Ryl-Kuchar's resignation, Ryl-Kuchar was notified that her health insurance had been cancelled retroactively effective June 15, 2006. (*Id.* at 21.) On the COBRA event notification from CCS-VEBA, processed November 19, 2003, CCS-VEBA stated that her benefits terminated on June 15, 2003 due to the qualifying event of "termination of employee employment." (*Id*. Ex. M.)

The record establishes several possible dates and reasons for Ryl-Kuchar's alleged termination. Ryl-Kuchar asserts that she resigned effective October 1, 2003. Yet, a COBRA event notification processed on November 19, 2003 states that her health plan, CCS-VEBA, terminated her benefits based on the qualifying event of Ryl-Kuchar's employment termination on June 15, 2003. Care Centers denies that Ryl-Kuchar was terminated as of June 15, 2003, despite the COBRA notification based on the qualifying event of her termination, and offers several different dates for Ryl-Kuchar's termination. According to Balthazor's Compliance Review, sometime after the birth of her triplets, Ryl-Kuchar was "discharged for misconduct related to direct payroll violations." (*Id*. Ex. F; Pl. L.R. 56.1 Stmt. ¶ 29.) In her affidavit, Balthazor states that "The termination of Kathy's employment occurred sometime after the middle of September 2003, when Kathy failed or refused to furnish information which I had requested on or about August 27, 2003" and that "Kathy's employment was not terminated by

5

Care Centers retroactive to mid-June of 2003, or to any other date." (Def. L.R. 56.1. Stmt. Ex. F; Pl. L.R. 56.1 Stmt. ¶ 31.) In a Oppenheimer Funds Distribution Form, Care Centers listed Ryl-Kuchar's termination date as August 1, 2003 (not June 15, 2003, or mid-September). (Pl. L.R. 56.1 Stmt. ¶ 28.) Finally, the Federal Rule of Civil Procedure 30(b)(6) deponent for Care Centers, Steinberg, testified in a deposition that Ryl-Kuchar resigned and had not been fired. (*Id.* ¶ 30.) At no point does the record establish that Care Centers ever notified Ryl-Kuchar that she had been terminated.

After Ryl-Kuchar either resigned or was fired, CCS VEBA sent a COBRA notice to Ryl-Kuchar that she did not receive. (Def. L.R. 56.1 Stmt. ¶ 42; Pl. L.R. 56.1. Resp. ¶ 42.) Ryl-Kuchar stated in her interrogatory that she discussed her rights under COBRA with Care Centers in October 2003, but later denied any recollection of the statement at her deposition. (Pl. L.R. 56.1. Resp. ¶¶ 59-60; Def. Reply L.R. 56.1. Resp. ¶ 24.) Ryl-Kuchar never elected to continue health care benefits under COBRA. Since Ryl-Kuchar's health benefits were canceled retroactive to June 15, 2003, CCS VEBA required Ryl-Kuchar's health care providers to refund insurance payments made after that date, leaving Ryl-Kuchar liable for those payments. (Pl. L.R. 56.1. Stmt. ¶ 25.)

Based on the cancellation of her health insurance retroactive to June 15, 2003, Ryl-Kuchar filed a First Amended Complaint on August 29, 2006, alleging retaliation due to and interference with the exercise of her rights under the FMLA in addition to intentional infliction of emotional distress. Care Centers filed counterclaims for a return of the wages and car allowance paid to Ryl-Kuchar since March 2003 based on claims of breach of contract and fiduciary duties. The court granted summary judgment on Care Centers's counterclaims in favor

6

of Ryl-Kuchar based on the voluntary payment doctrine. Care Centers filed the pending motion of summary judgment in response (Dkt. No. 107).

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Local Rule 56.1 requires that the moving party submit a separate statement of undisputed material facts that would entitle the moving party to judgment as a matter of law, listed in short numbered paragraphs with citations to the record to support those factual assertions. L.R. 56.1(a)(3). All the material facts in the 56.1 statement will be deemed admitted unless the opposing party submits a statement controverting those facts. *United States v. Funds in the Amount of $30, 670*, 403 F.3d 448, 454 (7th Cir. 2005).

## ANALYSIS

I. FMLA Rights

The court first turns to Ryl-Kuchar's claim of retaliation. An employer may not discriminate or retaliate against any individual for exercising her rights under the FMLA. 29 U.S.C. § 2615. To establish that Care Centers retaliated against Ryl-Kuchar for exercising her FMLA rights, Ryl-Kuchar may proceed either under the direct or indirect method established for claims of retaliations under other statutes, such as Title VII. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). To prevail under the direct method, Ryl-Kuchar must produce direct or circumstantial evidence that she engaged in protected activity under the FMLA and as a

7

result suffered an adverse employment action. *Sylvester v. SOS Children's Vill. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). For the indirect method, Ryl-Kuchar must proceed under the burden-shifting *McDonnell Douglas* paradigm of first proving a prima facie case and then establishing that the reason offered by the employer as legitimate and nondiscriminatory is in fact pretext. *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *King v. Preferred Tech. Group*, 166 F.3d 887, (7th Cir. 1999). The court considers Ryl-Kuchar to have chosen to proceed only under the direct method, having not attempted to establish elements of a prima facie case. *See Mitchell v. Dutchmen Manufacturing, Inc.*, 389 F.3d 746, 750 (7th Cir. 2004).

The parties dispute several facts beginning with whether and when Ryl-Kuchar took FMLA leave. According to Ryl-Kuchar, she took both intermittent FMLA leave, under 29 U.S.C. § 2612(b), from May 22 until the end of July 2003 and full-time FMLA leave at that point, after the birth of her triplets. Defending against Care Centers's claim that she provided no notice of either her intermittent FMLA leave and her full-time FMLA leave, Ryl-Kuchar contends that her FMLA certification form, which stated that she would be on bed rest from 25 weeks to two months after the birth of her triplets, was sufficient notice. Care Centers argues otherwise, asserting that Ryl-Kuchar failed to follow proper procedures to take FMLA leave, and therefore she was never engaged in the protected activity of exercising her rights under FMLA leave. According to Care Centers, Ryl-Kuchar never informed Care Centers "when her leave was going to start or end, whether she intended to take any part of her leave under the FMLA, or when her FMLA leave actually started, if ever." (Def. Mem. at 9.)

An employer may require an employee adhere to certain procedures to take FMLA leave.

8

Once an employee places an employer on notice that there is probable basis for FMLA leave, even if the employee does not mention the FMLA leave by name, the employer's duty to ask for additional information from the employee's health care provider or other reputable source as may be necessary to confirm the employee's entitlement is triggered. *Aubuchon v. Knauf Fiberglass, GMBH,* 359 F.3d 950, 953 (7th Cir. 2004). An employer may require that the leave be supported by a certification issued by the health care provider of the employee that the employee has a serious medical condition, such as pregnancy, qualifying for FMLA leave. 29 U.S.C. § 2613. An employer may also deny where an employee does not provide the employer with 30 days notice of the need to take leave, except if there is medical emergency or unforeseen events such as a premature birth, in which case the employee must provide notice as soon as practicable under the facts and circumstances of the particular case. *Aubuchon,* 359 F.3d at 951; Family Medical Leave Act of 1993, S. Rep. 103-3, 1993 U.S.C.C.A.N. 3, 25 (Jan. 27, 1993). Also taking into account the particular circumstances of a situation, the employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work. 29 C.F.R. § 825.309.

The FMLA's has specific requirements for intermittent leave intended to balance the needs of an employer with the needs of the employee. S. Rep. 103-3, 1993 U.S.C.C.A.N. at 26-27. Leave under the FMLA "shall not be taken by an employee, intermittently or on a reduced leave schedule unless the employee and the employer of the employee agree otherwise." 29 U.S.C. § 2612(b)(1). However, an employer's agreement is not required for during which a mother has a serious health condition in connection with the birth of her child or if the newborn has a serious health condition. 29 C.F.R. § 825.203. Intermittent leave is allowed only when

9

medically necessary. 29 U.S.C. § 2612(b)(1).

The court starts its analysis with the easier of the two leaves at issue: Ryl-Kuchar's full-time leave once her triplets were born. There is evidence in the record for which a reasonable jury could determine that Ryl-Kuchar sufficiently followed the requirements of the FMLA and Care Centers to take FMLA leave following the birth of her children. The director of human resources and her two supervisors knew of Ryl-Kuchar's pregnancy and Ryl Kuchar's intention to take maternity leave following the birth of her triplets. In addition, Ryl-Kuchar provided Care Centers sometime before May with an FMLA certification form stating her approximate due date of August 25, 2003 and her possible need to take leave at 25 weeks going forward until 2 months after the birth of her children. When Ryl-Kuchar gave birth prematurely on July 16, 2003 (more than 30 days after supplying Care Centers with her FMLA certification form), Ryl-Kuchar notified Sanders, her supervisor, as soon as practicable of the birth and that she would be taking maternity leave. *See* S. Rep. 103-3, 1993 U.S.C.C.A.N. at 25 (using a premature birth as an example of when 30-days notice may not be able to be given). Ryl-Kuchar also attempted to telephone Steinberg several times during her FMLA leave to discuss her return, but he never called her back.

Care Centers additionally contends that Ryl-Kuchar never received a written response to her FMLA request, as noted in Care Centers's FMLA policies and thus Ryl-Kuchar was not on FMLA leave. However, it appears that Care Centers did not follow its own policies in failing to respond by either rejecting or accepting Ryl-Kuchar's request once she submitted her FMLA certification form. Federal regulation allows an employer to require an employee to follow certain procedures in requesting FMLA leave. 29 C.F.R. § 825.302(d). "However, failure to

follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking of FMLA leave if the employee gives timely verbal or other notice." 29 C.F.R. § 825.302(d).

Whether Ryl-Kuchar was on intermittent leave from May 22 until the end of July is a different matter. There is no evidence in the record to support a finding by a reasonable jury that Ryl-Kuchar followed the proper procedures for intermittent FMLA leave. Although the FMLA certification form allowed for the possibility that Ryl-Kuchar could be on bed rest from 25 weeks until two months after the birth of her children, Ryl-Kuchar conceded at her deposition that she did not need to be on bed rest before the birth of her children. The court relies on the employee's assessment of her health in this instance, as compared to the estimation given by her health care provider in April 2003. *See Stoops v. One Call Communications, Inc*., 141 F.3d 309, 312 (7th Cir. 1998). Ryl-Kuchar had only one exploratory conversation at most, with Balthazor in February 2003, about working part-time after May 22, 2003, and never followed up on the issue. Although Ryl-Kuchar was submitting time-sheets showing her reduced hours, there was no agreement with her employer, as is required under 29 U.S.C. § 2612(b)(1), nor did Ryl-Kuchar give notice of her intention to go on intermittent leave under FMLA. Furthermore, at the time Ryl-Kuchar decided to reduce her hours, there is no evidence that she was suffering from a serious medical condition, such as complications from her pregnancy, for which she could not provide any notice, let alone the 30-day notice required by the FMLA. Rather, the record shows that Ryl-Kuchar unilaterally decided to reduce her hours without informing Care Centers. That Care Centers could have discovered Ryl-Kuchar's unilateral reduction in hours from reviewing her time sheets does not convert her part-time work into protected intermittent FMLA leave.

Although Ryl-Kuchar cannot establish that her FMLA leave extended as far back as May 22, 2003, she has demonstrated sufficient evidence that she engaged in protected activity from July 2003 until her resignation effective October 1, 2003, a period of time less than the 12 weeks allowed under the FMLA.

Ryl-Kuchar also succeeds in establishing evidence that she suffered an adverse employment action of either the termination of her benefits or her employment. The FMLA requires employers to maintain an employee's benefits while she is using FMLA leave. 29 C.F.R. § 825.209. In this case, the record establishes that Ryl-Kuchar's benefits were retroactively terminated June 15, 2003, after Ryl-Kuchar submitted her resignation on October 1, 2003, and that the qualifying event resulted in the loss of her benefits was the termination of her employment on June 15, 2003. This evidence sufficiently contradicts Care Centers's claim that CCS-VEBA acted without Care Centers's impetus to cancel the benefits based solely on the CCS-VEBA's assessment that Ryl-Kuchar's reduced hours meant that she was no longer a full-time employee entitled to benefits. In addition, there is genuine issues of material fact regarding whether Care Centers terminated Ryl-Kuchar and on what date. Evidence from Care Centers itself show that Ryl-Kuchar may have been fired as of June 15, 2003; on August 1, 2003, sometime in September 2003, or that she was not fired, but that she resigned on October 1, 2003. Yet, there is no evidence that Care Centers ever informed Ryl-Kuchar that she had been terminated. Furthermore, there is no dispute that Ryl-Kuchar's health care costs were being paid by CCS-VEBA during the time that she was on FMLA leave following the birth of her children and was canceled retroactive to June 15, 2003, until after Ryl-Kuchar submitted her resignation.

The shifting reasons and dates provided by Care Centers regarding Ryl-Kuchar's

12

termination when considered along with the timing of the termination of her health care benefits create genuine issues of material fact regarding whether there was a causal connection between Ryl-Kuchar's exercise of her FMLA rights and the termination of both her employment and her health care benefits. That Care Centers terminated Ryl-Kuchar and/or canceled her benefits based on her working part-time from May 22, 2003 to July 25, 2003 is not suspicious in and of itself. What is sufficiently suspicious is that (1) Ryl-Kuchar's benefits were not canceled until after she submitted her resignation, at which they were canceled retroactive to June 15, 2003, before she took FMLA leave; (2) Care Centers disputes that benefits were canceled on June 15, 2003 based on its retroactive termination of Ryl-Kuchar, despite a COBRA notification form to the contrary; (3) Care Centers provides several dates and reasons for terminating Ryl-Kuchar, yet no explanation for the dispute in dates and reasons; and (4) Ryl-Kuchar was never notified on any of these multiple dates of her termination. In addition, Care Centers's counterclaim seeking the return of wages and the car allowance, filed after Ryl-Kuchar brought this FMLA lawsuit provides further possible evidence of retaliation. The circumstantial evidence discussed above satisfies the court that there are genuine issues of material fact regarding whether Care Centers retaliated against Ryl-Kuchar because of her exercise of her FMLA leave. Furthermore, contrary to Care Centers's assertion, Care Centers's offering of COBRA benefits to Ryl-Kuchar after causing the termination of her benefits does not blunt the inferences of retaliation drawn from the circumstantial evidence, when taken in the light most favorable to Ryl-Kuchar.

Having found that genuine issues of material fact exist regarding Ryl-Kuchar's retaliation claim, the court also concludes that there are genuine issues of material fact for Ryl-Kuchar's interference claim. *See Kauffman*, 426 F.3d at 884. To establish that an employer interfered

13

with the exercise of one's FMLA leave, an employee need not prove any evidence of discriminatory intent. Rather, an employee must only show that she was entitled to the disputed leave and that the employer interfered with her exercise of those rights. Having sufficiently defeated summary judgment on her retaliation claim, Ryl-Kuchar then also survives on her interference claim: there is evidence in the record that when she engaged in protected activity of FMLA leave, she was either terminated or her benefits were. *See King*, 166 F.3d at 891.

II. Intentional Infliction of Emotional Distress

Ryl-Kuchar also brings a claim of intentional infliction of emotional distress, but, as Care Centers points out, produces no evidence at all in support. Ryl-Kuchar needs to establish (1) that Care Centers' conduct was extreme and outrageous; (2) that Care Centers intended its conduct to inflict severe emotional distress or knew there was at least a high probability its conduct would inflict such distress; and (3) that its conduct did in fact cause Ryl-Kuchar severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Extreme and outrageous conduct is that which goes "beyond all bounds of decency and [is] considered intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (*citing Kolegas v. Heftel Broad. Corp.,* 607 N.E.2d 201, 211 (Ill. 1992)); *Campbell v. A.C. Equip. Servs. Corp.*, 610 N.E.2d 745, 749 (Ill. App. Ct. 1993). "Illinois courts have found extreme and outrageous behavior to exist in the employer/employee context when the employer 'clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment.'" *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (*quoting Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001)).

No reasonable jury could find that Ryl-Kuchar had established the third element of a claim of intentional infliction of emotional distress. Ryl-Kuchar in her response to Care Centers's summary judgment provides only a one-paragraph argument regarding this claim and points to no evidence in the record that Ryl-Kuchar suffered emotional distress as a result of Care Centers's actions. Regardless whether the evidence would establish that Care Centers's conduct went beyond a typical employer/employee relationship, Ryl-Kuchar, as Care Centers points out, produced no evidence to demonstrate that she had suffered extreme emotional distress as a result of Care Centers's conduct. Ryl-Kuchar at most provided evidence that she owed money as a result of Care Centers's conduct, but not that she had suffered any emotional distress. Ryl-Kuchar's physician husband, mother, friend, and next-door neighbor all testified in depositions that they never witnessed Ryl-Kuchar cry or express emotional distress as a result of Care Centers's actions. (Def. L.R. 56.1 Stmt. ¶¶ 49-54.) Moreover, in Ryl-Kuchar's own deposition, she never attests to suffering from emotional distress as a result of Care Centers's conduct.

## CONCLUSION

Accordingly, Care Centers's motion for summary judgment (Dkt. No. 107) is denied as to Ryl-Kuchar's claims of retaliation and interference with regard to Ryl-Kuchar's exercise of her FMLA following the birth of her triplets (Count I). Those claims still stand and if not otherwise resolved will proceed to trial. Care Centers's motion for summary judgment is granted in favor of Care Centers and against Ryl-Kuchar on Ryl-Kuchar's claim of intentional infliction of emotional distress (Count V). This case is set for further status at 9:00 a.m. on December 18, 2006 to schedule the trial date as well as the dates for filing the proposed Final Pretrial Order

and scheduling the Final Pretrial Conference.

ENTER:

/s/ James F. Holderman
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: December 4, 2006