IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN RYL-KUCHAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05 C 3223 |
| | ) | |
| CARE CENTERS, INC., an Illinois | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND
GRANTING PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT

JAMES F. HOLDERMAN, Chief Judge:

On May 2, 2008, a ten-member jury concluded a four-day trial by returning a verdict in

favor of plaintiff Kathleen Ryl-Kuchar and finding that defendant Care Centers, Inc., violated the

Family and Medical Leave Act ("FMLA") when it cancelled Ryl-Kuchar's group health

insurance after Ryl-Kuchar had taken an FMLA leave.  The jury awarded Ryl-Kuchar

$31,621.08 in damages [260].  After the jury returned its verdict, the court requested that the

parties calculate prejudgment interest and liquidated damages and file any objections to the

calculations by May 8, 2008 [257].  Two motions followed.[1]  Care Center's filed a Motion for

Judgment Notwithstanding the Verdict [263], arguing that the evidence adduced at trial is

insufficient to support the jury's verdict.  Ryl-Kuchar filed a Motion for Entry of Judgment

Including Interest, Liquidated Damages, Attorneys' Fees, and Costs [261].  The court will

address each in turn.

---

[1]Care Centers, Inc. filed a third motion–Defendant's Motion for Sanctions [272]–on May
22, 2008, which this court will address after the motion has been fully briefed by the parties.

# I. **The Facts**

In 2003, Kathleen Ryl-Kuchar was employed as a dietary consultant by Care Centers, Inc., which is in the business of providing consulting services for nursing homes. Ryl-Kuchar began working at Care Centers in 1985 as a part-time dishwasher and worked her way up to dietary consultant through the years. Dietary consultants were responsible for assisting the dietary managers of individual nursing homes with staffing, inventory, policies and procedures, sanitary checks, budgets, and menus, and could perform their duties from home so long as they had access to a phone, e-mail, and fax machine. (Trial Tr. vol. 1, 133-36, Apr. 28, 2008.) As a dietary consultant, Ryl-Kuchar was a salaried employee of Care Centers. That is, Ryl-Kuchar received from Care Centers a set wage every two weeks based on a 40-hour work week. She did not receive overtime pay if she worked more than 40 hours per week, and her wages were not docked if she worked fewer than 40 hours per week. (Trial Tr. vol. 1, 40-42, 137.) Ryl-Kuchar was not required to punch a clock but was required to submit time sheets. Regardless of whether her time sheets reflected greater or fewer than 40 hours per week, however, her salary did not fluctuate. Ryl-Kuchar still received her set salary based on a 40-hour work week. (Trial Tr. vol. 1, 53-58, 137.)

In January 2003, Ryl-Kuchar found out that she was pregnant with triplets. (Trial Tr. vol. 1, 138-39.) Approximately one month later, Ryl-Kuchar told Barb Balthazor of Care Center's human resource department that she was pregnant. (Trial Tr. vol. 1, 139-40, 149.) According to Ryl-Kuchar, Balthazor gave her an FMLA certification form and told her that she could take twelve weeks of FMLA leave. Ryl-Kuchar took the FMLA certification form to her doctor, asked the doctor to complete the form, and then returned the completed form to Care

Centers. (Trial Tr. vol. 1, 145-48.) Ryl-Kuchar also met with Mark Steinberg, Chief Operating

Officer of Care Centers Clinical, LLC, the company that manages Care Center's employees, who

agreed to allow Ryl-Kuchar to work from her home during the pregnancy and agreed to pay Ryl-

Kuchar while she did so. (Trial Tr. vol. 1, 37-38, 60-63, 143-45.) Ryl-Kuchar and Steinberg did

not discuss how many hours per week Ryl-Kuchar would work from home. (Trial Tr. vol. 2,

286, Apr. 30, 2008.)

In mid-May 2003, Ryl-Kuchar began working from home because she was "too big to fit

behind [the steering] wheel" of her car. (Trial Tr. vol. 1, 156-57.) Ryl-Kuchar could not recall

the exact date she began working from home but explained that, even though she had stopped

working in the field, she continued to fully perform her job duties. (Trial Tr. vol. 1, 158.) From

her home, Ryl-Kuchar prepared budgets, food orders, and staffing schedules. She also held

meetings in her home and communicated with the individual nursing facilities by telephone and

facsimile. (Trial Tr. vol. 2, 185-88.) From her home, Ryl-Kuchar worked fewer than 35 hours

per week. (Trial Tr. vol. 2, 269-73, 281-82; Def. Ex. 3.)

On July 17, 2003, Ryl-Kuchar gave birth to three healthy baby boys. She experienced no

complications during the delivery and returned home with the triplets on July 21, 2003, where,

she said, she continued working until the end of July or beginning of August. (Trial Tr. vol. 2,

191-94.) Ryl-Kuchar explained that, when she came home with the triplets, her three sisters

were there to help, so she had time to "finish up the work that was left out there." (Trial Tr. vol.

2, 194.) When her sisters left, however, Ryl-Kuchar had "more [work with the triplets] than I

could have ever imagined." (Trial Tr. vol. 2, 194.) Consequently, Ryl-Kuchar stopped doing

work for Care Centers at that time but intended to resume her duties with Care Centers following

3

her leave.  Ryl-Kuchar could not pinpoint the date on which her FMLA leave started but testified that she intended to begin FMLA leave after the birth of her triplets.  (Trial Tr. vol. 2, 195, 291-300, 320-21.)

In September 2003, Ryl-Kuchar spoke with Steinberg by telephone to tell him that she was "getting ready to come back to work."  (Trial Tr. vol. 2, 195-96.)  Ryl-Kuchar never returned to work at Care Centers, however, because she did not think that she could both take care of her children and perform her duties as a dietary consultant.  Ryl-Kuchar resigned from Care Centers effective October 1, 2003.  (Trial Tr. vol. 1, 40, 134; Trial Tr. vol. 2, 195-96.)  Ryl-Kuchar considered her FMLA leave to have ended along with her employment on October 1, 2003.  (Trial Tr. vol. 2, 305.)

During the time period at issue in this litigation, Care Centers offered group health insurance to its eligible employees through Humana, Inc.  (Trial Tr. vol. 1, 39; Trial Tr. vol. 2, 198, 235, 319.)  Prior to her resignation, Ryl-Kuchar maintained health insurance through the Humana plan, and Humana initially paid all of her pregnancy-related medical bills.  (Trial Tr. vol. 2, 197-99.)  In November 2003, however, Ryl-Kuchar's Humana insurance was cancelled, with a retroactive termination date of June 15, 2003.  (Trial Tr. vol. 1, 38-39.)  Humana then sought to (and ultimately did) recover from Ryl-Kuchar's health care providers amounts it had paid out on Ryl-Kuchar's behalf for "anything from 6/15 onwards."  (Trial Tr. vol. 1, 101-03; Trial Tr. vol. 2, 209-10; Pl.'s Exs. C, D, K.)  Ryl-Kuchar has not yet paid any of the outstanding medical bills related to her pregnancy.  (Trial Tr. vol. 2, 350.)

According to Ryl-Kuchar, nobody from Care Centers told her that her group health insurance had been cancelled.  (Trial Tr. vol. 2, 199.)  Instead, Ryl-Kuchar said that she

4

discovered that her insurance had been cancelled when, in approximately January 2004, "the medical bills . . . started coming in that they were not covered." (Trial Tr. vol. 2, 200.) Ryl-Kuchar telephoned Humana to find out why Humana was not paying the bills and was told that Care Centers had retroactively cancelled her insurance. (Trial Tr. vol. 2, 208-09.) Ryl-Kuchar also telephoned Care Centers' human resources director, who told her that Care Centers could do nothing about the bills because Ryl-Kuchar had been "terminated." (Trial Tr. vol. 2, 201-02.)

Gale Rothner ("Rothner"), the wife of Care Centers' owner Eric Rothner (Trial Tr. vol. 3, 453, May 1, 2008), was the impetus for the retroactive cancellation of Ryl-Kuchar's insurance. Rothner initiated cancellation of Ryl-Kuchar's group health insurance after Rothner determined that Ryl-Kuchar's employment status with Care Centers had changed from full-time to part-time in June 2003. (Trial Tr. vol. 3, 456-59.) Rothner holds the position of trustee of CCS Employee Benefits VEBA, Inc. ("CCS VEBA"), a voluntary employee benefits association established to administer health insurance benefits for Care Centers and its health care facilities. (Trial Tr. vol. 3, 451-52.) According to Steinberg, Rothner is not a Care Centers employee. (Trial Tr. vol. 1, 76-77.) As CCS VEBA's trustee, Rothner was responsible for collecting insurance premiums, ensuring that claims were funded, and performing audits to determine employee eligibility. (Trial Tr. vol. 3, 452-53.) Care Centers' employees sometimes referred to CCS VEBA as Care Centers' "insurance department." (Trial Tr. vol. 2, 422.)

Rothner testified that she first became aware of Ryl-Kuchar's pregnancy sometime in August 2003, after seeing a photograph of Ryl-Kuchar's triplets. Rothner explained that she had not received FMLA paperwork for Ryl-Kuchar, so she contacted Balthazor to inquire about

Ryl-Kuchar's status with Care Centers. (Trial Tr. vol. 3, 455-56, 468.) Balthazor showed Rothner Ryl-Kuchar's FMLA certification form, which listed the date of Ryl-Kuchar's incapcaity as "from May 11th until 2 months post-delivery," but the form did not list a date on which Ryl-Kuchar was to begin FMLA leave. (Trial Tr. vol. 3, 502.) Balthazor also told Rothner that Ryl-Kuchar did not want to use her FMLA leave until "sometime in August." (Trial Tr. vol. 3, 487, 502.) Based on the information provided by Balthazor, Rothner, without contacting Ryl-Kuchar, determined that Ryl-Kuchar was not on FMLA leave. Rothner then requested copies of Ryl-Kuchar's time sheets from Care Centers. Upon Rothner's examination of Ryl-Kuchar's time sheets, Rothner determined that Ryl-Kuchar began working part-time hours during the week of June 15, 2003. Since it was Rothner's understanding that Care Centers' employees were required to maintain consistent, full-time hours to be eligible for insurance coverage under the Humana plan, Rothner concluded, again without contacting or notifying Ryl-Kuchar, that Ryl-Kuchar had become ineligible to participate in the plan as of June 15, 2003. (Trial Tr. vol. 3, 454-58, 483-87.) Rothner then requested a "termination of health benefits form" from Care Centers. Care Centers provided the form to Rothner, and Rothner directed Humana to terminate Ryl-Kuchar's benefits. (Trial Tr. vol. 3, 459-60.) As stated earlier, Rothner did not contact Ryl-Kuchar about her time sheets or FMLA leave, and CCS VEBA never directly notified Ryl-Kuchar that her health insurance had been terminated. (Trial Tr. vol. 3, 476, 487-89.)

Steinberg also reviewed Ryl-Kuchar's June and July 2003 time sheets and testified that he, too, believed Ryl-Kuchar's time sheets establish that she began working part-time on June 15, 2003. (Trial Tr. vol. 1, 70, 75.) Care Centers' employee handbook defines an employee as

full-time if he or she is "regularly scheduled to work 35 hours or more per week" and part-time if he or she "regularly works a minimum of 20 hours but less than 34 hours per week." (Trial Tr. vol. 2, 235-36; Def. Ex. 2.) It is undisputed that Ryl-Kuchar's timesheets from June 15, 2003 to July 27, 2003 show that she worked fewer than 35 hours each week during that time period. It is also undisputed that during June and July 2003 Care Centers continued to pay Ryl-Kuchar her full 40 hour per week salary and to deducted health insurance premiums from Ryl-Kuchar's wages. (Trial Tr. vol. 1, 46-57; Def. Ex. 3.) Steinberg explained that Care Centers paid Ryl-Kuchar her full-time salary after June 15th even though her time sheets showed that she was working part-time hours because "nobody was paying attention to her – to the time sheets." (Trial Tr. vol. 1, 70.) He recounted that early in 2003 Care Centers changed payroll procedures, "[s]o had the old system had been in place, we would have caught the fact that she was working less hours, would have changed her hours, would have changed her status a lot sooner." (Trial Tr. vol. 1, 71.) Steinberg testified that he believed Care Centers had officially changed Ryl-Kuchar's status from full- to part-time but could not identify the date when that "official" change occurred or any documents showing an "official" change in Ryl-Kuchar's status. (Trial Tr. vol. 1, 77.) Steinberg also testified that a full-time, salaried employee's paycheck stubs from Care Centers would always show 80 hours per two-week pay period, unless the employee had taken a vacation or "her employment status changed." (Trial Tr. vol. 1, 52-53.)

After Ryl-Kuchar's Humana insurance was cancelled, Rothner requested that COBRASource, Inc., send a COBRA notification packet to Ryl-Kuchar. (Trial Tr. vol. 3, 460-61.) John Blaida, the owner of COBRASource, testified that his company performed COBRA administration for CCS VEBA, which he believed was in the business of managing

7

nursing homes. Blaida explained that COBRASource's function was to notify its clients' employees of their COBRA rights and, if the employee elected COBRA coverage, to collect insurance premiums, ensure that insurance coverage remained in place, and terminate coverage when appropriate. (Trial Tr. vol. 2, 402-03.) On November 26, 2003, COBRASource sent a COBRA notification letter to Ryl-Kuchar at "1200 Sioux Court, New Lenos [sic], Illinois 60451." (Trial Tr. vol. 2, 405, 408-10; Joint Ex. 8.) The return address on the envelope listed the sender as: "COBRASource, Inc., 15 Commerce Drive, Suite 105, Grayslake, Illinois 60030." (Trial Tr. vol. 2, 411.) Blaida testified that COBRASource received nothing back from either the post office, notifying it that the package was undeliverable, or from Ryl-Kuchar, electing COBRA coverage. (Trial Tr. vol. 2, 405-08.)

Ryl-Kuchar maintained that she never received a COBRA letter notifying her that her group health insurance had been cancelled. (Trial Tr. vol. 2, 216.) Ryl-Kuchar explained that when she resigned from Care Centers she did not intend to continue her medical coverage because her medical bills had been paid by Humana and she had made arrangements for her children to have health coverage under her husband's insurance plan. (Trial Tr. vol. 2, 333, 341.) She also explained that, even if she had received a letter from "COBRASource, Inc.," she would not have opened it because the face of the envelope did not identify that the letter was from Care Centers. (Trial Tr. vol. 2, 379-80.)

Ryl-Kuchar presented two claims to the jury. First, Ryl-Kuchar argued that Care Centers interfered with her right under the FMLA to continued health insurance. Second, Ryl-Kuchar argued that Care Centers retaliated against her for taking leave under the FMLA. As to

Ryl-Kuchar's interferrence claim, the jury was instructed, without objection from either party, that:

> To prove her first claim, of interference with her right under the Family and Medical Leave Act to continued health insurance, Plaintiff Kathleen Ryl-Kuchar has to prove the following by a preponderance of the evidence:
> 1.  That she had a right to continued health insurance under the Family and Medical Leave Act; and
> 2.  That Defendant Care Centers deprived her of that right.

(Trial Tr. vol. 3, 658; Jury Instructions 8.)  As to Ryl-Kuchar's retaliation claim, the jury was instructed, again without objection, that:

> To prove her second claim, the Family and Medical Leave Act retaliation claim, Plaintiff Kathleen Ryl-Kuchar has to prove by a preponderance of the evidence:
> 1.  That Defendant Care Centers retroactively cancelled her health insurance; and
> 2.  That Defendant Care Centers would not have retroactively cancelled her health insurance had Plaintiff Ryl-Kuchar not taken leave under the Family and Medical Leave Act and everything else had been the same.

(Trial Tr. vol. 3, 658-59; Jury Instructions 9.)  Care Centers denied that it interfered with Ryl-Kuchar's rights under the FMLA and denied that it retaliated against Ryl-Kuchar for having taken leave under the FMLA.  (Trial Tr. vol. 3, 657; Jury Instructions 7.)  Care Centers also claimed that Ryl-Kuchar did not make reasonable efforts under the circumstances to mitigate her damages.  As to Care Centers' mitigation defense, the jury, without either side objecting, was instructed that:

> To succeed on this defense, Defendant Care Centers must prove by a preponderance of the evidence the following:
> 1.  That health-insurance coverage that would have covered the medical bills in question was available to Plaintiff Ryl-Kuchar;
> 2.  That Plaintiff Ryl-Kuchar failed to make reasonable efforts under the circumstances to obtain that health-insurance coverage;
> 3.  That had Plaintiff Ryl-Kuchar made reasonable efforts to obtain the health-insurance coverage, then she would have obtained the health-insurance coverage; and

      4.      That the dollar amount of the medical bills in question would have been paid by that health insurance.

(Trial Tr. vol. 3, 660; Jury Instructions 10.)

      The jury returned a general verdict in favor of Ryl-Kuchar. The jury also awarded Ryl-Kuchar damages of $31,621.08, which is the total amount of her unpaid medical bills [260].

## II. Defendant Care Centers' Motion for Judgment Notwithstanding the Verdict

      In its motion for judgment as a matter of law notwithstanding the verdict, Care Centers argues that "there was no evidence presented on either claim which, when viewed most favorably to the Plaintiff and disregarding conflicting unfavorable testimony, could have resulted in a conclusion by reasonable people that the Plaintiff had made out a prima facie case" of retaliation or interference. (Def.'s Mot. JNOV 5.) Alternatively, Care Centers contends that it is entitled to a reduction of the damages awarded by the jury because "the jury must have entirely disregarded both the Defendant's evidence, as well as the Court's instructions, regarding mitigation." (Def.'s Mot. JNOV 5.)

      Judgment as a matter of law is appropriate only where there is no legally sufficient evidentiary basis for a reasonable jury to find for the prevailing party on the issue. Fed. R. Civ. P. 50(a); *see Lasley v. Moss*, 500 F.3d 586, 590 (7th Cir. 2007). In considering a motion for judgment as a matter of law, this court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Lasley*, 500 F.3d at 590; *Zimmerman v. Chi. Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004). The court may not weigh the evidence, make credibility determinations, or substitute its judgment for the jury's. *Zimmerman*, 360 F.3d at 623. In order to uphold the jury's verdict, however, there must be more

than a mere scintilla of evidence that would have allowed the jury to find for the prevailing party. *Id.*; *Mut. Serv. Cas. Ins. Co v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001).

The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave during any twelve-month period for several reasons, including the birth of a child or children and to care for the child or children. 29 U.S.C. § 2612(a)(1). The FMLA also entitles an employee to maintain insurance coverage under the employer's group health plan throughout the duration of any leave under the Act under the conditions coverage would have been provided if the employee had continued in employment for the duration of the leave, 29 U.S.C. § 2614(c)(1), and provides that an employee's taking leave under the Act "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced," 29 U.S.C. § 2614(a)(2). An employer may not interfere with an employee's exercise of the rights provided under the FMLA. 29 U.S.C. § 2615(a)(1); *see Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008). Similarly, an employer may not retaliate against an employee for exercising her rights under the FMLA. 29 U.S.C. § 2615(a)(2); *see Lewis*, 523 F.3d at 741.

A.      **The Jury's Determination of Care Centers' Liability**

Care Centers raises three challenges to the sufficiency of the evidence supporting the jury's finding that Care Centers interfered with Ryl-Kuchar's rights under the FMLA or retaliated against Ryl-Kuchar when it cancelled her group health insurance. First, Care Centers argues that the jury's verdict cannot stand because Ryl-Kuchar presented no evidence that Care Centers, itself, interfered with Ryl-Kuchar's rights under the FMLA. According to Care Centers, CCS VEBA determined that Ryl-Kuchar became ineligible to participate in the group health insurance plan. (Def.'s Mot. JNOV 6-7.) Similarly, Care Centers says that it was CCS VEBA that initiated

the termination of Ryl-Kuchar's group health insurance.  Thus, Care Centers reasons, the most

that the jury could have found from the evidence is that Care Centers "fail[ed] to take any action

to stop CCS VEBA from taking the action it took."  (Def.'s Mot. JNOV 7-8.)

Care Centers' argument fails because the jury could have found from the evidence

submitted at trial that CCS VEBA did not act unilaterally in cancelling Ryl-Kuchar's group

health insurance.  It is undisputed that Rothner's testimony established that she set into motion

the process that led to cancellation of Ryl-Kuchar's group health insurance.  Rothner testified

that she initiated investigation into Ryl-Kuchar's status upon seeing a photograph of Ryl-

Kuchar's triplets; conducted an audit of Ryl-Kuchar's time sheets; and determined that

Ryl-Kuchar began consistently working part-time in June 2003, making her ineligible to

participate in the group health plan.  Rothner's testimony also established that she requested a

termination of health benefits form from Care Centers prior to instructing Humana to cancel Ryl-

Kuchar's insurance.  (Trial Tr. vol. 3, 455-60, 483-89, 502.)  Although it is unclear who at Care

Centers provided the termination of benefits form to Rothner, Care Centers submitted no

evidence that it conducted an independent audit of Ryl-Kuchar's time sheets or made an

evaluation independent of Rothner's as to Ryl-Kuchar's eligibility for group health insurance.  A

jury therefore reasonably could have found that, by acting at Rothner's direction to provide the

termination of benefits form to her, Care Centers had adopted Rothner's conclusions and actions

as its own.  Moreover, based on Rothner's request for the form alone (the content of the form was

not presented to the jury) and cancellation of Ryl-Kuchar's insurance only after having received

the form from Care Centers, a jury reasonably could have concluded that Care Center's

authorization was required before Rothner could cancel Ryl-Kuchar's insurance.

12

The jury also was entitled to disbelieve Care Centers' evidence that Rothner was not its employee or agent. Care Centers presented testimony that Rothner was not its employee, but testimony was also presented showing that, among other things, Care Centers' employees referred to CCS VEBA as "the insurance department" and that at least one of CCS VEBA's vendors believed CCS VEBA was in the business of managing nursing homes. (Trial Tr. vol. 2, 402-03, 422.) Care Centers produced no documentary evidence establishing that Rothner was solely CCS VEBA's employee or showing Care Centers' relationship to CCS VEBA. This court should not, and will not, second-guess the jury's credibility determinations or the weight the jury gave testimonial evidence.

Second, Care Centers argues that the jury's verdict cannot stand because "there is no evidence that [Ryl-Kuchar's] insurance coverage was cancelled while, or because, [Ryl-Kuchar] was on an FMLA leave." (Def.'s Reply 4.) Calculating backward from October 1, 2003, the date on which Ryl-Kuchar testified that her FMLA leave ended, Care Centers contends that the earliest possible date on which Ryl-Kuchar's FMLA leave could have started was July 1, 2003. (Def.'s Mot. JNOV 8.) Ryl-Kuchar's group health insurance was cancelled effective June 15, 2003. Thus, Care Centers argues, it could not have interfered with Ryl-Kuchar's rights under the FMLA because Ryl-Kuchar was not on FMLA leave when her group health insurance was cancelled. (Def.'s Mot. JNOV 6-8; Def.'s Reply 4-5.)

Rothner's testimony established that she began her investigation into Ryl-Kuchar's status after she saw a photograph of Ryl-Kuchar's triplets in August 2003. Rothner's testimony also established that she knew that Ryl-Kuchar had a right to FMLA leave to deliver and care for her children because Rothner asked Balthazor whether Ryl-Kuchar was on FMLA leave before

13

delving further into Ryl-Kuchar's eligibilty for coverage under the group insurance plan. Balthazor showed Rothner Ryl-Kuchar's FMLA certification form, which listed the date of Ryl-Kuchar's incapacity as "from May 11th until 2 months post-delivery." Balthazor also told Rothner that Ryl-Kuchar intended to start her FMLA leave "sometime in August." Despite the information provided to her by Balthazor, Rothner testified that she determined that Ryl-Kuchar was not on FMLA at the time she began her investigation. (Trial Tr. vol. 3, 455-60, 483-89, 502.)

Care Centers argues that it could not have known that Ryl-Kuchar was on FMLA leave because Ryl-Kuchar kept it "in the dark as to when that leave was going to commence." (Def.'s Mot. JNOV 7.) The FMLA states that an employee must "provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave" under the Act. 29 U.S.C. § 2612(e)(2)(B). It is undisputed that in early 2003 Ryl-Kuchar advised Care Centers that she intended to take FMLA leave "sometime in August," after the birth of her triplets. (Trial Tr. vol. 3, 487, 502.) It is also undisputed that Rothner began her investigation after she saw a picture of Ryl-Kuchar's triplets. (Trial Tr. vol. 3, 455-56, 468.) Consequently, the jury was well-within its reasonable discretion to reject Rothner's testimony that Ryl-Kuchar was not on FMLA leave in August 2003. The jury also reasonably could infer from Rothner's testimony that Rothner began her investigation into Ryl-Kuchar's status because Rothner believed Ryl-Kuchar was on leave to care for her newborn children—an event entitling an employee to FMLA protections.

There also was sufficient evidence from which a jury reasonably could have found that, prior to starting her FMLA leave, Ryl-Kuchar had accrued health insurance benefits through July

27, 2003, and that she had a right under the FMLA to continued insurance coverage after July 27, 2003, through her resignation from Care Centers. Even though Rothner and Steinberg testified that Ryl-Kuchar's time sheets showed that Ryl-Kuchar worked fewer than 35 hours per week from June 15, 2003 through July 27, 2003, and so she was not eligible to participate in the group insurance plan (Trial Tr. vol. 1, 70, 75; Trial Tr. vol. 3, 454-58, 483-87), Ryl-Kuchar's paycheck stubs reflected no change in Ryl-Kuchar's employment status. Ryl-Kuchar was paid as a full-time, salaried employee through the date she gave birth to her triplets and deductions for group health insurance were made from her paychecks through the pay period ending July 27, 2003. (Trial Tr. vol. 1, 46-57; Def. Ex. 3.) In light of the paycheck stubs, Steinberg's inability to identify any documentation officially changing Ryl-Kuchar's status from full- to part-time, and Ryl-Kuchar's assertions that she intended to start her leave after the birth of her children, a reasonable jury could have found that Ryl-Kuchar's unpaid FMLA leave started on July 28, 2008. If so, Ryl-Kuchar was entitled to maintain the insurance benefits she accrued prior to July 28, 2003, as well as to continued insurance coverage during the duration of her leave. *See* 29 U.S.C. § 2614(a)(2), (c)(1).

Third, Care Centers argues that the jury's verdict cannot stand because Ryl-Kuchar presented no evidence that Care Centers retaliated against Ryl-Kuchar when it cancelled her group health insurance. (Def.'s Mot. JNOV 5-6.) The jury returned a general verdict finding in favor of Ryl-Kuchar in this litigation. The verdict form did not ask the jury to specify the theory under which it found for Ryl-Kuchar. Because the court has determined that the jury had sufficient evidence before it at the trial to find that Care Centers interfered with Ryl-Kuchar's rights under the FMLA, the court need not address Ryl-Kuchar's retaliation claim here.

15

**B.      The Jury's Damages Award**

Care Centers also challenges the jury's award of $31,621.08 in damages.  Care Centers

contends that "there was no evidence upon which a jury could have found that the total amount

of [Ryl-Kuchar's] unpaid medical bills was the proper measure of her damages" because the

"uncontroverted evidence" showed that Ryl-Kuchar was sent a COBRA notice.  (Def.'s Mot.

JNOV 9.)  Had Ryl-Kuchar elected COBRA coverage, Care Centers argues, "her damages would

have been, at most, limited to the amount of the insurance premium."  (Def.'s Mot. JNOV 9.)

A plaintiff fails to mitigate damages when she engages in conduct that aggravates or

increases her damages.  *Lasley*, 500 F.3d at 590.  To prevail on a failure to mitigate defense, the

defendant must prove by a preponderance of the evidence that (1) plaintiff failed to exercise

reasonable care, under the circumstances, to mitigate her damages, and (2) plaintiff's failure to

exercise reasonable care caused the her "to suffer an identifiable item of harm not attributable to"

the defendant's conduct.  *Id.*

In this case, the evidence presented by the parties concerning Ryl-Kuchar's failure to

elect COBRA coverage is susceptible to different interpretations.  On one hand, Care Centers

submitted evidence that a letter was sent to Ryl-Kuchar notifying her of her right to elect

COBRA coverage that would have covered her medical expenses effective June 16, 2003.  (Trial

Tr. vol. 2, 402-11; Joint Ex. 8.)  From this evidence, a jury reasonably could have concluded that

Ryl-Kuchar failed to exercise reasonable care to mitigate her damages when she failed to elect

COBRA coverage.

On the other hand, Ryl-Kuchar testified that, at the time she resigned from Care Centers,

she did not intend to elect COBRA coverage because the medical bills associated with her

16

pregnancy had been paid by Humana and her children had secured health insurance under her

husband's plan. (Trial Tr. vol. 2, 333, 341.) Ryl-Kuchar also testified that Care Centers did not

notify her that her group health insurance had been retroactively cancelled and that she never

received the COBRA notice. (Trial Tr. vol. 2, 199, 216, 333, 341.) Moreover, premiums for

Ryl-Kuchar's group health insurance for the time period at issue had been deducted from her

paychecks (Trial Tr. vol. 1, 46-57; Def. Ex. 3), and the COBRA notice contained a typo in

Ryl-Kuchar's mailing address (Trial Tr. vol. 2, 405-10; Joint Ex. 8). From this evidence, a jury

reasonably could have found that Ryl-Kuchar never received the COBRA notice, and even if she

had, she had no reason to believe she needed COBRA coverage.

Care Centers emphasizes evidence that, it says, "reflects that [Ryl-Kuchar] had at least

twice stated under oath in this case (once in her sworn answers to interrogatories and at least

once in her deposition) that she called [Care Centers] in October of 2003" to inquire about

COBRA coverage. (Def.'s Mot. JNOV 9.) But the jury also heard testimony from Ryl-Kuchar at

trial that she first contacted Care Centers to inquire about why her medical bills were not being

paid in January 2004. (Trial Tr. vol. 2, 200.) The jury's verdict reflects that it chose to credit

Ryl-Kuchar's trial testimony over her prior statements. Neither this court nor any court may

disturb that finding. *See Zimmerman*, 360 F.3d at 623.

Accordingly, the jury's award of damages to Ryl-Kuchar in the amount of $31,621.08

was reasonable based on the evidence presented at the trial.

### III. Plaintiff's Motion for Entry of Judgment

In her motion for entry of judgment, Ryl-Kuchar seeks to recover: (1) the jury's award of damages totalling $31,621.08; (2) interest of $11,105.59; and (3) liquidated damages of $42,726.67. Ryl-Kuchar also requests attorneys' fees and costs.

### A.      Lost Employment Benefits

Under the FMLA, an employer who violates the Act shall be liable for "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I). As discussed above, the jury's award of $31,621.08, which represents the total amount of medical bills paid by Humana on Ryl-Kuchar's behalf and subsequently recovered by Humana after Care Centers cancelled Ryl-Kuchar's health insurance in violation of the FMLA, is an appropriate measure of the employment benefit lost by Ryl-Kuchar in this case.

### B.      Interest

The FMLA provides that an employer who violates the Act shall be liable for interest on the amount of lost wage or employment benefit "calculated at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(ii). The language of section 2617 makes an award of interest mandatory on a finding that an employer has violated the Act. *See* § 2617(a)(1) ("Any employer who violates section 2615 of this title *shall* be liable to any eligible employee affected . . . ."); *see also Hite v. Vermeer Mfg. Co.*, 361 F. Supp. 2d 935, 948-49 (S.D. Iowa 2005).

Ryl-Kuchar has requested prejudgment interest totalling $11,105.59. Ryl-Kuchar explains that she calculated the interest from June 15, 2003 through May 8, 2008, using the historical monthly prime rate set by the Federal Reserve for the period from June 15, 2003 to April 30, 2008, and the historical daily prime rate for the period from May 1 to May 8, 2008.

19

She compounded interest monthly.  Care Centers objects to the interest rate used by Ryl-Kuchar, monthly compounding, and the time period for which Ryl-Kuchar seeks interest.

Each of Care Centers' objections must be overruled.  When calculating prejudgment interest in the absence of a statutorily defined rate, the Seventh Circuit has instructed that "the best starting point is to award interest at the market rate, which means an average of the *prime rate* for the years in question." *Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (emphasis in original).  Although Ryl-Kuchar has not averaged the prime rate in her calculations, she has based her calculations on the monthly prime rate set by the Federal Reserve during the months for which she seeks interest.  The court finds Ryl-Kuchar's methodology acceptable.  The Seventh Circuit has also recognized that compounded prejudgment interest is allowable, *see Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937-38 (7th Cir. 2003); *Gorenstein Enter., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 437 (7th Cir. 1989), and that prejudgment interest serves two purposes:  (1) to make plaintiff whole, and (2) to discourage delay by the defendant, *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002); *Gorenstein Enters., Inc.,* 874 F.2d at 436.  Allowing Ryl-Kuchar to collect interest from the date that Care Centers retroactively deprived her of her health insurance serves the, admittedly unsuccessful, purpose of discouraging defendants from undue delay in resolving plaintiff's claims.  Moreover, "prejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued." *Am. Nat'l Fire Ins. Co.,* 325 F.3d at 936.  In this case, Care Centers chose to make the date of Ryl-Kuchar's loss retroactive to June 15, 2003, thus prejudgment interest should be calculated from that date.

20

The court therefore awards Ryl-Kuchar prejudgment interest in the amount of $11,105.59.

### C.    Liquidated Damages

The FMLA provides for liquidated damages in an amount equal to the amount of lost benefit plus the interest on that benefit.  29 U.S.C. § 2617(a)(1)(A)(iii).  An employer may be relieved of liquidated damages only on a showing that its violation of the FMLA was (1) "in good faith," and (2) "that the employer had reasonable grounds for believing that the act or omission was not a violation of" the FMLA.  *Id.*

Care Centers has not met its burden of demonstrating that it had reasonable grounds to believe that cancelling Ryl-Kuchar's group health insurance would not violate the FMLA. Rothner testified that in August 2003 she saw a photograph of Ryl-Kuchar's triplets, which triggered her investigation into Ryl-Kuchar's employment status.  Rothner's investigation initially revealed that Ryl-Kuchar's file contained an FMLA certificate listing Ryl-Kuchar's incapacity as "from May 11th until 2 months post-delivery" and that Ryl-Kuchar told human resources that she intended to start her FMLA leave "sometime in August."  Rothner nevertheless determined, without speaking to Ryl-Kuchar, that Ryl-Kuchar was not on FMLA leave.  (Trial Tr. vol. 3, 455-60, 483-89, 502.)  Based on the evidence before Rothner, however, this court believes that a reasonable employer attempting to determine whether termination of an employee's group health insurance would violate the FMLA would have contacted the employee before cancelling the employee's insurance.

Care Centers also had no procedures in place to monitor the actual work hours of employees in Ryl-Kuchar's position, and Care Centers had no apparent procedures to determine

whether its employees in Ryl-Kuchar's position were on leave. Care Centers admitted that "nobody was paying attention" to Ryl-Kuchar's time sheets because the payroll system was in flux in 2003. And, although Steinberg believed that Ryl-Kuchar was a part-time employee during the time at issue in Rothner's investigation, Care Centers also could point to no documents showing that Ryl-Kuchar's employment status had been officially changed from full- to part-time. Instead, Care Centers paid Ryl-Kuchar a full-time salary and deducted group health insurance premiums from her paychecks through the end of July 2003. (Trial Tr. vol. 1, 70, 77.) Care Centers then waited until Ryl-Kuchar stopped performing her work duties so that she could care for her newborns before determining when and whether Ryl-Kuchar had been utlizing FMLA leave. (Trial Tr. vol. 3, 455-56, 468.) But Care Centers did not contact Ryl-Kuchar to ask her. (Trial Tr. vol. 2, 199.) Thus Care Centers' purported attempt to determine when and whether Ryl-Kuchar was on FMLA leave does not seem reasonable to this court, and Care Centers' conclusions are contrary to the trial evidence showing Care Centers had not changed Ryl-Kuchar's employment status from full- to part-time prior to August 2003.

Finally, the fact that Care Centers did not contact Ryl-Kuchar directly to inform her that her group health insurance had been retroactively cancelled back to the period during her pregnancy but before the birth of her triplets demonstrates to this court that Care Centers did not act in good faith in this matter.

This court therefore awards Ryl-Kuchar $42,726.67 in liquidated damages.

### D.    Attorneys' Fees and Costs

The court will rule on Ryl-Kuchar's request for attorneys' fees and costs after the court has reviewed the parties' submissions. *See Buchanan v. Stanships, Inc.*, 485 U.S. 265, 268-69

22

(1988) (explaining that motion for fees is wholly collateral to merits judgment); *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1065 (7th Cir. 1992).

## IV.  Conclusion

For the foregoing reasons, Care Centers' Motion for Judgment Notwithstanding the Verdict [263] is denied.

Ryl-Kuchar's Motion for Entry of Judgment [261] is granted.  Ryl-Kuchar is awarded:

1.      $31,621.08 in lost employment benefits;

2.      $11,105.59 in prejudgment interest; and

3.      $42,726.67 in liquidated damages.

        $85,453.34 TOTAL

Judgment in the total amount of $85,453.34 is entered in favor of plaintiff Kathleen Ryl-Kuchar and against defendant Care Centers, Inc.  Pursuant to Rule 54(b), there is no just reason to delay entry of this final judgment.

Ryl-Kuchar's request for attorneys' fees and costs is taken under advisement.  Counsel for Ryl-Kuchar is ordered to prepare and file a petition for attorneys' fees and costs, accompanied by supporting documents, by July 16, 2008.  Care Centers' response is due by July 30, 2008.  Ryl-Kuchar's reply is due by August 13, 2008.

ENTER:

James F. Holderman

_____

Date:  June 16, 2008

23